UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| ANDRE PHILLIPS, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | NO. 3:18-cv-00973 |
| | ) | CHIEF JUDGE CRENSHAW |
| CORECIVIC, INC., et al., | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Andre Phillips, an inmate of the South Central Correctional Facility in Clifton, Tennessee, has filed a pro se complaint under 42 U.S.C. § 1983. (Doc. No. 1.) He has also filed an application for leave to proceed in forma pauperis (IFP) (Doc. No. 2), a motion to appoint counsel (Doc. No. 3), and a motion for a temporary restraining order/preliminary injunction. (Doc. No. 4.)

**I.   Initial Review**

  **A.   PLRA Screening Standard**

Pursuant to the Prison Litigation Reform Act (PLRA), 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, and 42 U.S.C. § 1997e, the Court must dismiss any IFP complaint that is facially frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. Similarly, § 1915A provides that the Court shall conduct an initial review of any prisoner complaint against a governmental entity, officer, or employee, and shall dismiss the complaint or any portion thereof if the defects listed in § 1915(e)(2)(B) are identified. Under both statutes, this initial review of whether the complaint states a claim upon which relief may be granted asks whether it contains "sufficient factual matter,

1

accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Hill v. Lappin, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Applying this standard, the court must view the complaint in the light most favorable to Plaintiff and, again, must take all well-pleaded factual allegations as true. Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009) (citing Gunasekera v. Irwin, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). Furthermore, pro se pleadings must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). However, pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure, Wells v. Brown, 891 F.2d 591, 594 (6th Cir. 1989), nor can the court "create a claim which [a plaintiff] has not spelled out in his pleading." Brown v. Matauszak, 415 F. App'x 608, 613 (6th Cir. 2011) (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975)).

B.    Section 1983 Standard

Plaintiff seeks to vindicate alleged violations of his federal constitutional rights under 42 U.S.C. § 1983. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a § 1983 claim, the plaintiff must allege two elements: (1) a deprivation of rights secured by the

Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. Carl v. Muskegon Cnty., 763 F.3d 592, 595 (6th Cir. 2014).

**C.    Allegations and Claims**

Plaintiff went through Tennessee Department of Correction (TDOC) classification at Bledsoe Correctional Complex, where he was diagnosed with latent tuberculosis. (Doc. No. 1 at 3.) The doctor at Bledsoe prescribed a nine-month course of treatment with Isoniazid (also known as "INH") and vitamin B6. (Id.) Plaintiff alerted the staff at Bledsoe that he had Hepatitis C. (Id.) The doctor informed Plaintiff that while INH was known to cause major liver damage, his blood would be monitored at intervals to monitor his liver enzymes and an alternate therapy would be implemented if abnormal liver activity was detected. (Id.)

On May 23, 2017, Plaintiff was transferred to Trousdale Turner Correctional Complex, a TDOC prison operated by defendant CoreCivic, Inc. (Id.) When Plaintiff arrived at Trousdale Turner, his INH regimen was continued but his blood monitoring was not. (Id. at 4.) Three weeks after his arrival, Plaintiff asked a nurse at medication call why no blood draws had been performed, and she told him to submit a sick call request to be seen at the clinic. (Id.) Plaintiff submitted approximately 12 to 15 sick call requests between June 13 and August 31, 2017, but none were answered. (Id.) He also filed grievances that went unanswered. (Id.) He began to notice health issues such as pain in his side and swelling in his lower legs and feet, which he presented to Nurse Boner when he reported for medication call. (Id.) Plaintiff told Nurse Boner about the warning the doctor at Bledsoe had given him concerning possible liver damage resulting from INH, and also informed the nurse of the numerous requests he had made for blood draws. (Id.) Nurse Boner told Plaintiff to come to the clinic, and she would make a referral to the doctor. (Id.) However, Plaintiff was "never called to see the doctor nor were any other sick calls honored while at Trousdale." (Id.)

3

Fearing the effects INH might be having on him, Plaintiff stopped taking the medication. (Id.) However, after three missed doses, Plaintiff was called to the medication cart and told that further missed doses would result in his placement in isolation and the issuance of a disciplinary report for defiance. (Id.) Plaintiff resumed his INH regimen out of fear of reprisal. (Id.)

On December 15, 2017, Plaintiff was transferred to South Central Correctional Facility. (Id.) Leg irons could not be used to secure Plaintiff during the transfer due to the swelling in his ankles. (Id. at 4–5.) Upon arriving at South Central, Plaintiff submitted a sick call request due to the swelling and pain. (Id. at 5.) He was seen on January 11, 2018 by FNP Kelly, who immediately discontinued the INH, ordered a blood draw, prescribed treatment with a diuretic, medicine for acid reflux and congestive heart failure, and ordered that Plaintiff be assigned a bottom bunk. (Id.)

Plaintiff's blood was drawn on January 17, April 11, and May 9, 2018. (Id.) On May 9, Plaintiff was seen by Dr. Bush, who informed him that he had liver disease and an enzyme count that could indicate cancer. (Id.) "Plaintiff asked if he should tell his family immediately and Dr. Bush stated 'Yes, you should start preparing them for an untimely death.'" (Id.)

On June 21, 2018, Plaintiff went to emergency sick call with chest pains. (Id.) He received an EKG and spoke with FNP Dean, who questioned why Dr. Bush would have told Plaintiff to prepare for an untimely death based on his test results. (Id.) FNP Dean told Plaintiff that Dr. Bush had referred him for treatment, "but you don't have enough time to complete the treatment." (Id.) On July 5, 2018, FNP Dean informed Plaintiff that he was in "the last stage before liver failure," but that he did not have enough time left in TDOC to receive the appropriate treatment. (Id. at 6.) FNP Dean encouraged Plaintiff to seek treatment at the county health department upon his release, and told him that the health department was receiving grants and funding for this type of treatment. (Id.) FNP Dean ordered an ultrasound, which was performed on July 9, 2018. (Id.)

4

On July 20, 2018, Plaintiff was seen at sick call for chest pain, and a repeat EKG was performed. (Id.) Plaintiff was also given "a cup of white chalky liquid." (Id.) He was again told that he would not receive liver treatment because of the relatively short time remaining on his sentence. (Id.) "Plaintiff was told that this decision was made by the corporate office." (Id.)

Plaintiff alleges that he suffers from chronic pain and other progressively worsening symptoms, as well as mental anguish and anxiety based on Dr. Bush's prediction of his untimely demise. (Id.) He alleges that he has not received pain medication despite multiple complaints of chronic pain. (Id. at 7.)

Plaintiff has sued CoreCivic and Correct Care Solutions, LLC (CCS)—the prison operator and medical services provider, respectively—over his treatment at Trousdale Turner. He has sued CoreCivic over his treatment at South Central, which CoreCivic also operates. He claims that these Defendants were deliberately indifferent to his serious medical needs and failed to train their employees properly, in violation of his constitutional rights. (Id. at 7–10.) He seeks an order enjoining Defendants to provide immediate liver treatment, as well as compensatory and punitive damages.

**D.     Analysis**

Plaintiff claims that he was denied appropriate medical care in violation of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. "Eighth Amendment jurisprudence clearly establishes that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain that is violative of the Constitution." Darrah v. Krisher, 865 F.3d 361, 367 (6th Cir. 2017) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 105 (1976)) (internal quotation marks omitted). Though private entities, both CoreCivic and CCS are state actors because "they were performing the traditional state function of operating a prison"

and staffing a prison clinic, respectively. Street v. Corr. Corp. of Am., 102 F.3d 810, 818 (6th Cir. 1996) (internal quotation omitted); Starcher v. Corr. Med. Sys., Inc., 7 F. App'x 459, 465 (6th Cir. 2001).

In order to succeed in bringing a deliberate indifference claim in the medical context, Plaintiff must allege the deprivation of a "sufficiently serious" medical need by a Defendant who acted with a "sufficiently culpable state of mind." Darrah, 865 F.3d at 367–68 (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Villegas v. Metro. Gov't of Nashville, 709 F.3d 563, 570 (6th Cir. 2013). The state of mind described by "deliberate indifference" is demonstrated not by mere medical negligence, but only when an official knows of and disregards an excessive risk to the inmate's health or safety. Farmer, 511 U.S. at 836–37.

Here, Plaintiff's medical need for blood monitoring while taking INH was recognized by the prescribing doctor at Bledsoe, establishing its seriousness for purposes of this initial review. Villegas, 709 F.3d at 570. While that doctor's prescription of INH (for Plaintiff's infectious disease) was continued without delay at Trousdale Turner, the prescribed blood monitoring (for Plaintiff's safety) allegedly was not, despite a barrage of sick call requests and grievances filed by Plaintiff. He apparently had no trouble receiving the INH, to the point that his absence from medication call generated a prompt threat of disciplinary action, even while his sick call requests were being ignored. Plaintiff alleges that these facts demonstrate that his "stage four(4) liver damage was caused by the Defendant Correct Care Solutions, LLC's deliberate indifference to [his] serious medical needs" while at Trousdale Turner. (Doc. No. 1 at 6, ¶ 39.) He further alleges that this deliberate indifference to his need for blood monitoring was the result of CCS's "policies

6

and customs of ignoring medical provider recommendations and orders at Trousdale." (Id. at 9, ¶ 55.)

Viewing the complaint in the light most favorable to Plaintiff, the Court finds that it states a colorable claim for denial of needed medical attention that—in light of Plaintiff's treatment with INH—presented an excessive risk to his health that CCS employees knew of and disregarded. Cf. Maldonado v. Terhune, 28 F. Supp. 2d 284, 290 (D.N.J. 1998) (recognizing that prisons must treat latent tuberculosis "with the utmost care and caution"; that INH is known to have potential side effect of liver damage; but that prescribing INH does not amount to deliberate indifference as long as "prison officials [are] mindful of side effects and take reasonable steps to avoid serious harm"). However, CCS may not be found liable under § 1983 unless the violation of Plaintiff's rights was caused by the execution of a corporate policy or custom. See Starcher, 7 F. App'x at 465 (finding medical services contractor subject to liability under § 1983 only if deprivation of rights caused by corporate policy); Street, 102 F.3d at 818 (affirming summary judgment on deliberate indifference claim against corporate defendant in absence of evidence that employee acted pursuant to any corporate "policy or custom").

Plaintiff alleges that, pursuant to a CCS policy of "ignoring medical provider recommendations and orders" (Doc. No. 1 at 9, ¶ 55), his preexisting treatment plan of medication and blood monitoring was only partially implemented when he arrived at Trousdale. Because the harm that Plaintiff allegedly suffered is due to his treatment plan being partially rather than fully implemented, the Court construes his complaint as alleging that a CCS policy or custom of selective compliance with outside physicians' orders—rather than a policy of ignoring all such orders—was the cause of the Eighth Amendment violation he claims. The complaint thus states a colorable claim against CCS.

At the time of his transfer to South Central, Plaintiff was suffering significant pain and swelling, and put in a sick call request that yielded a relatively prompt clinic visit. As a result, the INH was discontinued and his symptoms were treated by South Central medical staff. (Doc. No. 1 at 4–5.) Plaintiff's deliberate indifference claim related to his medical care at South Central is thus not related to the withholding of treatment to monitor the health of his liver, but to the withholding of the treatment ordered by Dr. Bush to address his liver damage. (Id. at 8, ¶ 46.) Plaintiff was told that this decision to withhold liver treatment was "made by the corporate office," based on "the time remaining on his sentence, which [was] approximately 15 weeks." (Doc. No. 1 at 6, ¶ 38.) He alleges three different occasions—June 21, July 5, and July 20, 2018—when he was told that liver treatment would not be started because he did not have enough time left to complete the treatment. (Id. at 5–6, ¶¶ 33, 35, 38.)

Plaintiff's medical need for the treatment prescribed for his liver damage is objectively serious, and the allegation that such treatment was withheld solely because of his time remaining in prison is sufficient to state a colorable claim of deliberate indifference to that serious medical need. As the decision to withhold treatment was allegedly made at the corporate level, CoreCivic's policies or customs are sufficiently implicated for the Eighth Amendment claim against it to go forward.

In the second and final count of his complaint, Plaintiff alleges that CoreCivic and CCS "failed and refused to train all staff to provide access to medical care on a continuous basis, [to] properly and efficiently evaluate and identify the need for specialized medical care, to properly process and evaluate inmates from one level of care to another, and to efficiently provide on site medical care at Trousdale." (Doc. No. 1 at 9–10.) He alleges that CoreCivic failed to properly train the staff at South Central, and that both Defendants' failure to train is demonstrated by their

8

"refusal to correct the inadequate medical care even when confronted by hundreds, if not thousands of medical request[s] and grievances at Trousdale and South Central[.]" (Id. at 10.) These allegations appear to invoke the "limited circumstances" in which a decision not to train employees about their legal duties may rise to the level of an official policy for purposes of § 1983. Connick v. Thompson, 563 U.S. 51, 61 (2011).

In Connick, the Supreme Court recognized that local government employers cannot be vicariously liable under § 1983 for their employees' actions, but only directly liable for their own acts taken pursuant to official policy. 563 U.S. at 60 (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978)). The Supreme Court further recognized that it is possible to establish a municipal (or, in this case, corporate[1]) policy of failing to adequately train employees, but only if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Id. at 61 (quoting Canton v. Harris, 489 U.S. 378, 388 (1989)). If the employer is on notice that its training program will cause constitutional violations, its "policy of inaction" in response to that notice "is the functional equivalent of a decision by the [employer] itself to violate the Constitution." Id. at 61–62.

In light of this authority, this Court considers Plaintiff's allegations that CoreCivic and CCS failed to train their employees (Doc. No. 1 at 9–10) to be alternative grounds for establishing the liability of these corporate Defendants for the claimed Eighth Amendment violations, rather than a separate claim requiring screening at this initial stage. See Street, 102 F.3d at 817 (affirming dismissal of private prison-management corporation in the absence of proof that its employee's

---

[1] The holding of Monell, which involved a municipal corporation, applies to private corporations as well. Street, 102 F.3d at 818.

conduct was result of "any policy or custom of [corporation] or because of the inadequacy of [employee's] training").

## II.     Motion to Appoint Counsel

Plaintiff has filed a motion to appoint counsel to represent him in this matter. (Doc. No. 3.) An indigent plaintiff in a civil action, unlike a criminal defendant, has no constitutional right to the appointment of counsel. Lanier v. Bryant, 332 F.3d 999, 1006 (6th Cir. 2003); Lavado v. Keohane, 992 F.2d 601, 605 (6th Cir. 1993). Rather, the appointment of counsel is a "privilege justified only by exceptional circumstances." Lavado, 992 F.2d at 606 (citations omitted). Whether to appoint counsel for an indigent plaintiff in a civil action is a matter within the discretion of the district court. Id. at 604. In making the determination of whether the circumstances warrant the appointment of counsel, courts are to consider the type of case presented and the abilities of the plaintiff to represent himself. Id. at 606 (citations omitted). Evaluation of these factors in turn "generally involves a determination of the complexity of the factual and legal issues involved." Id. (internal quotation marks and citation omitted).

The Court directs the Clerk to appoint counsel for Plaintiff from the civil pro bono panel. After process is served and Defendants respond to the complaint, the Magistrate Judge should expedite case management.

## III.    Conclusion

For the reasons set forth above, Plaintiff states non-frivolous claims for deliberate indifference against Defendants CoreCivic and CCS, and process shall issue on Plaintiff's claims. The motion to appoint counsel will be granted and the motion for injunctive relief will be reserved at this time.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE